**UNITED STATES of America, Plaintiff,**

v.

**Robert D. HOUSE, a/k/a Robert House, and Nancy C. House, a/k/a/ Nancy House, Defendants.**

**No. CIV. 98–2057(RLE).**

United States District Court, D. Minnesota.

April 10, 2000.

---

Friedrich Anson Paul Siekert, Roylene Ann Champeaux, U.S. Attorney, Minneapolis, MN, for Plaintiff.

Robert D. House, Rothsay, MN, pro se.

## ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(c)(1), upon the Motion of the Plaintiff for Summary Judgment, and for Leave to File a Memorandum in response to the Defendants' Motion in Opposition to Summary Judgment.[1] A Hearing on the Motion was conducted on January 11, 2000, at which time, the Defendants appeared *pro se,* and the Plaintiff appeared by Friedrich A.P. Siekert, Esq. For reasons which follow, the Plaintiff's Motion for Summary Judgment is granted.

---

**1.** At the Hearing, we granted leave for the Defendants to submit an untimely Memorandum in Opposition to the Plaintiff's Motion for Summary Judgment. Thereafter, the Defendants, through their legal counsel, Michael R. Ruffenach, Esq., submitted an Memorandum in Opposition to Summary Judgment. In due course, the Plaintiff, by formal Motion, requested leave to file a Reply Memorandum. Fairness dictates that the Plaintiff be afforded an opportunity to respond to the Defendants' belated Memorandum and, therefore, we grant the Plaintiff's Motion, and we have considered both the Defendants' Memorandum in Opposition, and the Plaintiff's Reply Memorandum, in ruling on the issues before us.

## II. *Factual and Procedural History*

This action arises out of the Plaintiff's action to evict the Defendants from certain real property that is situated in Wilkin County, Minnesota. According to the Plaintiff, the Defendants, who are married, refused to vacate that real property notwithstanding a valid foreclosure by advertisement, and the expiration of the statutory redemption period. In response, the Defendants have filed a Counterclaim for rents, which they allege are owed to them, because of their inability to rent the property, as a result of the Plaintiff's assertedly wrongful foreclosure.

The history which precedes the foreclosure process is uncomplicated. In connection with loans made in 1972, and in May of 1978, the Defendants executed three promissory notes in favor of the Plaintiff. See, *Declaration of Darrell S. Strand, Ex. A.* On May 31, 1978, the Defendants executed a real estate mortgage. *Id., Ex. B.* The mortgaged premises included two parcels of real property that was situated in Wilkin County. *Id.*

According to the Plaintiff, after the Defendants defaulted on their payments, the Farmers Home Administration ("FMHA") began the mortgage foreclosure process. In an attempt to effectuate service of process upon the Defendants, the FMHA procured the services of the Wilkin County Sheriff's Department. On July 5, 1996, Wilkin County Deputy Sheriff Rick Fiedler ("Fiedler") personally served the individual who was farming the property—a Shannon Maack ("Maack")—on July 5, 1996, with a Notice of Mortgage Foreclosure Sale, and Notice of Postponement Sale. See, *Declaration of Rick Fiedler,* at ¶¶ 8, 13; *Affidavit of Friedrich A.P. Siekert, Exs. A, B.*

Although the Wilkin County Sheriff's Department was able to effectuate service upon Maack, its Deputies aver that, despite their best efforts, they could not locate the Defendants during that Summer. Between June 28, 1996, and August 28, 1996, the Sheriff's Deputies made at least 33 separate, unsuccessful attempts to personally serve the Defendants. See, *Fiedler Dec.,* at ¶¶ 6, 7; *Ex. C.* As attested by Fiedler:

> * * * I attempted to serve Mr. and Mrs. House on seven more occasions on July 23, July 30 (twice), July 31 (three times), and August 16. On most of these visits to the House farm in Rothsay, Minnesota, I would observe a dog and one or more of the vehicles that were licensed to the Houses. It always appeared that someone was residing at the premises but I never saw Mr. or Mrs. House. On each occasion, I would knock on the front door of the house, but no one would answer. On one occasion when I knocked on the front door, I recall observing the shades being shut from the inside; however, no one answered the door at that time. On other occasions when I would knock on the door, I also believed that there were individuals present inside the house, but no one would answer the door.

*Fiedler Dec.,* at ¶ 11.

As related by Fiedler, based upon his observations, his inability to find the Defendants, as well as information from other Deputies, who were also unable to locate, let alone to contact the Defendants personally, it appeared that the Defendants were attempting to evade service of the mortgage foreclosure sale Notice. *Id.* at ¶ 15. Consequently, on August 28, 1996, Fiedler served the Notice of Mortgage and Foreclosure Sale, and Notice of Postponement of Sale, on Sharon Leske ("Leske"), a person of suitable age who was temporarily residing on the Defendants' property during the Summer. *Id.* at ¶ 14; *Strand Dec., Ex. D.*

In addition to serving Leske, Fiedler served Maack because he was farming the Defendant's land that Summer in accordance with a contract which he had recorded in March of 1995. See, *Declaration of Shannon Maack,* at ¶¶ 5, 7. Maack recounts that, at the time of the formation of

the contract with the Defendants, they had informed him that they anticipated the FMHA would attempt to foreclose on the property that Summer. *Id.* at ¶ 9. As such, the Defendants informed Maack that they were planning on being away for most of the Summer, so as to avoid being served with the Notice of Mortgage Foreclosure. *Id.* In addition, Maack maintains that, prior to the Defendants' departure, they introduced him to Leske, and stated that she was going to take care of the Defendants' residence while they were gone. *Id.* at ¶ 10. During the Summer, Maack saw Leske on the property about five times per week, and was under the impression that she stayed there overnight on a number of occasions. *Id.* at ¶ 12.

Sometime during the Summer of 1996, and prior to the mortgage foreclosure, Maack had several conversations with the Defendants about the sale. As averred by Maack, on September 12, 1996, he displayed, to the Defendants, the papers that had been previously served upon him on August 28, 1996. *Id.* at ¶ 15.[2]

Maack's father, Robert Maack ("R.Maack") confirmed his son's version of the events, and stated that, in April of 1996, he had a conversation with Mr. House, during which Mr. House stated that the FMHA was going to initiate a foreclosure of the Defendants' farm and, therefore, that he and his wife intended to spend most of the Summer away from the property so as to avoid being served with the Notice of Mortgage Foreclosure. See, *Declaration of Robert Maack*, at ¶ 4. R. Maack also contends that, based upon his own observations, it appeared that Leske was residing at the Defendants' farm during that Summer. See, *R. Maack Dec*, at ¶ 5. Finally, as averred by R. Maack, during a subsequent conversation, Mr. House revealed that, on August 28, 1996—when Fiedler had served Leske—he and Mrs.

House were hiding in the basement of their home. See, *R. Maack Dec*, at ¶ 8.

Leske has corroborated many of the facts cited above, but she asserts that, on August 28, 1996, while she was being served, the Defendants were not present at their home. See, *Seikert Aff., Deposition of Sharon R. Leske,* at 45–49. Leske recounts that, upon being served, she placed the mortgage foreclosure papers in her purse. *Id.* at 50. However, after informing the Defendants that she had the papers, Mr. House responded that he did not want them. See, *Leske Dep.,* at 50–51. About a week later, Leske and the Defendants went to visit their lawyer, Mr. Krekelberg ("Krekelberg"), who advised Leske to keep the papers in her purse. See, *Leske Dep.,* at 52–58.

According to Mr. House, he and his wife owed over $100,000 on the notes and mortgages that were executed in favor of the United States. See, *Siekert Aff., Deposition of Robert House,* at 22. Mr. House has admitted that he received notice from the FMHA of its intent to foreclose. *Id.* at 23. As well, Mr. House was aware that the foreclosure process had commenced during the Summer of 1996, based upon his conversations with Maack. *Id.* at 23–24, 27–28, 33.

Mr. House also became aware, from a variety of sources, of the attempts by the Wilkins County Sheriff's Department, to serve him with foreclosure papers during the Summer of 1996. *Id.* at 34–36. Mr. House corroborated Leske's contention, that he was not at home on August 28, 1996, and that he had informed Leske that he did not want the papers that had been served upon her. *Id.* at 40–42. In addition, according to Mr. House, after visiting with Krekelberg, he examined the papers that were served upon Leske, and told her to "put those papers back in your purse

---

**2.** Maack purchased one parcel of the Defendants' property at the foreclosure sale, which was conducted on October 23, 1996, and therefore, because the Defendants did not re-

deem within the statutory period, he considers himself to be the owner of that parcel. See, *Declaration of Shannon Maack,* at ¶¶ 18 and 20.

and leave them there, because they didn't serve them to the right party." *Id.* at 43.[3]

Accordingly, the Defendants argue that the Plaintiff's mortgage foreclosure procedure was defective, because they were not properly served. Therefore, according to the Defendants, the Plaintiff's Motion for Summary Judgement should be denied as without merit. Moreover, as previously noted, the Defendants contend, in their Counterclaim, that they are entitled to any lost rents which were caused by the Plaintiff's purportedly wrongful foreclosure of their property.

### III. *Discussion*

A. *Standard of Review.* Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. *Carter v. St. Louis Univ.,* 167 F.3d 398, 400 (8th Cir.1999); *Prudential Ins. Co. v. National Park Med. Center, Inc.,* 154 F.3d 812, 818 (8th Cir.1998). For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party. See, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Liebe v. Norton,* 157 F.3d 574, 578 (8th Cir.1998); *Dodd v. Runyon,* 114 F.3d 726, 729 (8th Cir.1997).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure;* see also, *Anderson v. Liberty Lobby, Inc.,* supra at 256, 106 S.Ct. 2505; *Chism v. W.R. Grace & Co.,* 158 F.3d 988, 990 (8th Cir.1998). Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* supra at 322, 106 S.Ct. 2548; see also, *Greer v. Shoop,* 141 F.3d 824, 826 (8th Cir.1998); *Mayard v. Hopwood,* 105 F.3d 1226, 1228 (8th Cir.1997). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* supra at 323, 106 S.Ct. 2548; see also, *Bell Lumber and Pole Co. v. United States Fire Ins. Co.,* 60 F.3d 437, 441 (8th Cir. 1995); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 510 (8th Cir.1995); *Settle v. Ross,* 992 F.2d 162, 163 (8th Cir. 1993).

B. *Legal Analysis.*

■ 1. *The Validity of the Plaintiff's Foreclosure.* As a general rule, a mortgagee is not entitled to possession of real property without a foreclosure. See, *Minnesota Statutes Section 559.17, Subdivision 1.* Under Minnesota Law, to entitle any party to make a foreclosure, it is requisite:

---

**3.** Mrs. House has confirmed most of Mr. House's testimony, and she joins him in concluding that the only defect in the foreclosure proceeding was the lack of service upon them personally. See, *Siekert Aff.; Deposition of Nancy House Dep.,* at 51.

(1) That some default in a condition of such mortgage has occurred, by which the power to sell has become operative;

(2) That no action or proceeding has been instituted at law to recover the debt then remaining secured by such mortgage, or any part thereof, or, if the action or proceeding has been instituted, that the same has been discontinued, or that an execution upon the judgment rendered therein has been returned unsatisfied, in whole or in part;

(3) That the mortgage has been recorded and, if it has been assigned, that all assignments thereof have been recorded.

*Minnesota Statutes Section 580.02.*

The Plaintiff has firmly established that all of Minnesota's statutory requirements for foreclosure, as they have been listed above, have here been met. See, *Strand Dec.,* at ¶¶ 7,8; *Ex. B.* As such, the Defendants do not contest the fact that the right to foreclose on their property had vested in the Plaintiff, prior to the foreclosure proceedings. See, *Lindberg v. Gebo,* 381, N.W.2d 905, 907 (Minn.App.1986). Rather, the Defendants maintain that the foreclosure was procedurally invalid because of the Plaintiff's failure to properly effectuate service of process upon them. See, *Defendants' Memorandum of Law in Opposition to Motion for Summary Judgment.*

2. *The Requirements of Minnesota Statues Section 580.03.* Under *Minnesota Statutes Section 580.03,* prior to a mortgage foreclosure:

> Six weeks' published notice shall be given that such mortgage will be foreclosed by sale of the mortgaged premises or some part thereof, and at least four weeks before the appointed time of sale a copy of such notice shall be served in like manner as a summons in a civil action in the district court upon the person in possession of the mortgaged premises, if the same are actually occupied. If there be a building on such premises used by a church or religious corporation, for its usual meetings, service upon any officer or

trustee of such corporation shall be a sufficient service upon it.

*Id.;* see also, *Gerdin v. Princeton State Bank,* 384 N.W.2d 868, 871 (Minn.1986) (stating that, prior to mortgage foreclosure proceedings, Minnesota law requires only six weeks published notice, and service thereof, upon the person in possession of the mortgaged premises); see also, *Veldhuizen v. United States,* 986 F.2d 503, 1993 WL 13781 (8th Cir. 1993) (Table Decision); *Peterson v. Island,* C4–94–2425, 1995 WL 118895 *4 (Minn.App. March 21, 1995), rev. denied (Minn., May 16, 1995); *Hommerding v. Travelers Ins. Co.,* 393 N.W.2d 389, 389 (Minn.App.1986).

■  As argued by the Defendants, service by publication was not adequately executed as required by Rule 4.04, Minnesota Rules of Civil Procedure. According to the Defendants, under Rule 4.04, a condition precedent to obtaining jurisdiction through service by publication is the filing of a Complaint and Affidavit with the Court. As such, if an Affidavit is not filed prior to the publication of the first Notice, a Court does not obtain jurisdiction. See, *Defendants' Memorandum in Opposition,* at 3–5, citing *Schuett v. Powers,* 288 Minn. 542, 180 N.W.2d 253 (1970) (involving service by publication, under Rule 4.04, in a personal injury action).

We agree with the Defendants that, had the Plaintiff only attempted to effectuate service by publication, in order to satisfy the service prong of Minnesota Statutes Section 580.03, the requirements of Rule 4.04 would apply. However, when the Plaintiff published Notice of the mortgage foreclosure sale, for a total of fifteen weeks, from July 5, 1996, to October 18, 1996, it merely satisfied the **publication** prong of Section 580.03. As such, in the present case, it is clear that the requirements of Rule 4.04 are not applicable to the Plaintiff's publication of the foreclosure Notice.

As noted by the Plaintiff, prior to the foreclosure proceedings involving the Defendants, the Notice of Foreclosure was published for six consecutive Fridays, between July 5, 1996, and August 9, 1996. See, *Strand Dec., Ex. D, August 9, 1996 Affidavit of Publication.* After the foreclosure sale was postponed, the Notice of Foreclosure Sale, with the Notice of Postponement Sale, was published for nine consecutive Fridays, between August 23, 1996, and October 18, 1996. See, *Strand Dec., Ex. D, October 18, 1996 Affidavit of Publication.* Consequently, the Plaintiff has satisfied the requirement of Section 580.03, that Notice be published for six weeks prior to the foreclosure sale.

■ *a. Service under Section 580.03.* In addition to six weeks of published Notice, Section 580.03 requires that, at least four weeks prior to the foreclosure sale, a copy of the notice "shall be served in like manner as a summons in a civil action in the district court upon the person in possession of the mortgaged premises, if the same are actually occupied." *Minnesota Statutes Section 580.03.* As noted previously, the Defendants contend that, because an Affidavit was never filed with the Court, prior to the Plaintiff's publication, its attempt to serve them, via publication of the Notice of Foreclosure, was invalid. In response, the Plaintiff argues that, in addition to service via publication, service was properly effectuated when Maack was served, as an occupant of the premises, under Section 580.03. See, *Skartum v. Koch,* 174 Minn. 47, 218 N.W. 446 (1928). However, we need not address these contentions because, regardless of whether the Plaintiff's attempts to effectuate service on the Defendants via publication, or by serving an occupant of the land under Section 580.03, were satisfactory, it is clear that the service provisions of Section 580.03 were satisfied when the Plaintiff personally served Leske, prior to the foreclosure sale. See, *Rule 4.03, Minnesota Rules of Civil Procedure; Minnesota Statutes Section 380.03.*

Under, Rule 4.03, service of a Summons, within the State of Minnesota, may be accomplished by "delivering a copy to the individual personally or by leaving a copy at the individual's usual place of abode with some person of suitable age and discretion then residing therein." Of course, under the Minnesota law which is applicable to the issues here, whether service of process was proper is a question of law. See, *Amdahl v. Stonewall Ins. Co.,* 484 N.W.2d 811, 814 (Minn.App.1992), rev. denied (Minn., July 16, 1992). Service of process must accord with statutory requirements. See, *Berryhill v. Sepp.,* 106 Minn. 458, 119 N.W. 404, 404 (1909). "Service of process in a manner not authorized by the rule is ineffective service." *Tullis v. Federated Mut. Ins. Co.,* 570 N.W.2d 309, 311 (Minn.1997).

Service of process is intended to give notice to a defendant and, thus, service of process must be reasonably calculated to reach the defendant. See, *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (stating "due process [requires] * * * notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"); *Minnesota Mining & Mfg. Co. v. Kirkevold,* 87 F.R.D. 317, 324 (D.Minn.1980) (stating purpose of service of process rules is to make likely that actual notice be brought to defendant).

"In deciding whether an individual is 'then residing therein' for purposes of service of process, there must be a nexus between the individual and the defendant that establishes some reasonable assurance that notice would reach the defendant." *O'Sell v. Peterson,* 595 N.W.2d 870, 872 (Minn.App.1999). For example, a relationship of confidence, including, but not limited to, a familial relationship, might establish a nexus to support the conclusion that notice would reach the defendant. See, *Nowell v. Nowell,* 384 F.2d 951, 953 (5th Cir.1967) (distinguishing nexus be-

tween tenant and landlord, from absence of nexus between tenants in same building); *Plushner v. Mills,* 429 A.2d 444, 446 (R.I.1981) (concluding service on defendant's daughter was valid because she was a trusted member of household and had a substantial nexus with defendant).

In addition, the duration of an individual's presence, the frequency of the presence, or the intent to return may also establish a nexus between the individual, then residing in the defendant's residence, and that defendant. See, *O'Sell v. Peterson,* supra at 872, citing *Sangmeister v. McElnea,* 278 So.2d 675, 676–77 (Fla.App. 1973) (stating one who resides or visits home of relative for sufficient period of time may reside therein); *Holtberg v. Bommersbach,* 236 Minn. 335, 52 N.W.2d 766, 768 (1952) (concluding intent to return may be of "extreme importance" in determining place of abode). Finally, evidence that the service actually reached the intended person strongly supports a conclusion that service is valid, because due process has been afforded. See, *Minnesota Mining and Mfg.,* supra at 323 (stating rules governing service should be liberally construed to uphold substituted service when prompt actual notice occurs); *Larson v. Hendrickson,* 394 N.W.2d 524, 526 (Minn.App.1986) (stating actual notice contributed to finding that the service was effective).

Here, the Deputy Sheriffs of Wilkin County attempted service at the Defendant's home on at least 33 separate occasions, between June 28, 1996, and August 28, 1996. Finally, on August 28, 1996, after being notified by Leske that the Defendants were not at home, Fiedler delivered the mortgage foreclosure papers to her, because of his observation that she appeared to be residing in the house throughout that Summer. *Fiedler Dec.,* at ¶ 14.

As averred by Maack, Leske was recruited by the Defendants to keep an eye on their residence while they were absent. See, *S. Maack Dec.,* at ¶ 10. During the Summer, Maack would drive by the Defendants' farm nearly every day and, as a result, he observed Leske at the residence about five times per week. *Id.* at ¶¶ 11–12. Based upon his observations of Leske, Maack concluded as follows:

> [Leske] * * * appeared to be staying overnight. On three or four occasions I would go to the house to talk with Sharon Leske to inform her of various developments. Specifically, there were several occasions when I was anticipating that either some friends or my brother would be coming on the property to obtain bales of hay from a storage shed that was near the house. * * * On one occasion, I went to the house in the morning to talk to her and she appeared in her night clothes. I would also see Ms. Leske at various times during the day, including the morning, throughout the day, and in the evening hours. Based on my observations, she definitely appeared to be staying overnight on a number of evenings throughout the summer. I would also often see Ms. Leske's blue pick-up truck on many of the occasions when I would be at the property.

*Id.* at ¶ 12.

In addition, R. Maack was introduced to Leske by the Defendants, and was informed that she would be caring for the Defendants' home that Summer. See, *R. Maack Dec.,* at ¶ 5. During that summer, R. Maack would visit, or drive by the Defendants' farm, from three to four times per week, and would see Leske around the house, or in the garden at various times throughout the day. *Id.* at ¶ 6. Based upon his observations, R. Maack was also under the impression that Leske was residing at the Defendants' farm. *Id.*

Finally, Leske has verified that she maintained a substantial nexus to the Defendants' farm, both prior to, and during, the Summer of 1996. According to Leske, she had known the Defendants for many years. See, *Leske Dep.,* at 7–8. In addition, she had maintained a garden at the Defendants' farm, and had stayed over-

night there on occasion, during the Summer of 1996. *Id.* at 17–19. Leske testified that the Wilkin County Sheriff's Deputies had been to the Defendants' farm a number of times, during the Summer, looking for the Defendants, and that she had recorded those visits. *Id.* at 17–18, 24–25, 31–34. Leske also testified that, on August 28, 1996, she was staying overnight at the Defendants' residence. *Id.* at 46. Both Mr. and Mrs. House have testified that they were aware of Leske's presence at their home that night, and that it was with their permission. See, *R. House Dep.*, at 39; *N. House Dep.*, at 76–77. Also, Mrs. House testified that Leske had stayed overnight at their residence "once in a while before," and that there existed a standing agreement, between themselves, and Leske, that she could stay overnight whenever she wanted. See, *N. House Dep.*, at 77. Further, about a week to ten days after the date of service, the Defendants were specifically informed, by Leske, that she had been served with papers intended for them. See, *R. House Dep.*, at 41; *Leske Dep.*, at 50.

We conclude, given the fullness of the Record before us, that substitute service

on Leske, who was an adult woman, and who was a daily visitor, and periodic overnight guest at the Defendants' household during the Summer of 1996, is sufficient for purposes of Rule 4.03(a). Such service of process was intended to give notice to the Defendants, and was reasonably calculated to reach them. See, *Mullane v. Central Hanover Bank & Trust Co.*, supra; *Minnesota Mining & Mfg. Co. v. Kirkevold*, supra at 324. Our conclusion is supported by decisions from the Minnesota Courts, as well as from those of foreign jurisdictions.[4] See, *O'Sell v. Peterson*, supra at 873–874 (holding that leaving Summons and Complaint with the defendant's 14-year-old stepson, who was staying at defendant's home for a six-day, non-custodial visitation, constituted substitute service of process on defendant); citing, *M. Lowenstein & Sons, Inc. v. Austin*, 430 F.Supp. 844, 845 (S.D.N.Y.1977) (stating adult daughter, who was home from college overnight, was residing at her parents' home); *Magazine v. Bedoya*, 475 So.2d 1035, 1035–36 (Fla.App.1985) (concluding mother-in-law, who was visiting defendant for six weeks, and who told process server that she lived there, was resid-

---

4. Further, we note that, as the Court enunciated in *Larson v. Hendrickson*, 394 N.W.2d 524, 526 (Minn.App.1986), Rules governing service are liberally construed when the intended recipient has actual notice of the lawsuit. See also, *Thiele v. Stich*, 425 N.W.2d 580, 584 (Minn.1988). *Larson* involved service on a tenant in a defendant's house, while the defendant was out of state. The issue was whether the house was the defendant's "usual place of abode." In that context, the defendant's actual notice of the suit contributed to the Court's finding that service was effective under Rule 4.03. *Larson v. Hendrickson*, supra.

This "actual notice" exception has been recognized only in cases involving substitute service at a defendant's residence. See, e.g., *Minnesota Mining & Manufacturing Co. v. Kirkevold*, 87 F.R.D. 317 (D.Minn.1980). One reason for this approach is that there may be no place significantly more desirable for the papers to be left. See, *Thiele v. Stich*, supra at 584, citing 4A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1096 at 79 (2d ed.1987). Rule 4 is otherwise taken literally, and cannot be satisfied by

service on defendant's place of work or business. *Thiele v. Stich*, supra, citing *Thompson v. Kerr*, 555 F.Supp. 1090, 1093 (D.Ohio 1982). However, actual notice will not subject defendants to personal jurisdiction absent substantial compliance with Rule 4. *Thiele v. Stich*, supra; *Lundgren v. Green*, 592 N.W.2d 888, 892 (Minn.App.1999); *Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir.1986).

Here, it is evident that the actual notice exception applies to Fiedler's service upon Leske, since the service took place at the Defendants' residence, and Mr. House testified that he was aware, from several sources, that the Wilkin County Sheriff was attempting to serve him with foreclosure papers, and also, that he was specifically aware that the foreclosure proceeding had commenced in the Summer of 1996, based upon his conversations with Maack. See, *Deposition of Robert House*, at 23–24, 27–28, 33–36. Also, Maack had personal conversations with the Defendants on August 21, September 12, and October 9, 1996, about the upcoming mortgage foreclosure sale. See, *Declaration of Shannon Maack*, at ¶¶ 13, 15–16.

ing there); *Sangmeister v. McElnea,* supra at 676–77 (holding four-month visitor was residing therein); *Plushner v. Mills,* supra at 446 (concluding that daughter, who was placed in charge of father's home in his absence, was residing therein); *Wichert v. Cardwell,* 117 Wash.2d 148, 812 P.2d 858, 860 (1991) (holding daughter, who was watching parents' home, and staying overnight, met the residing requirement); see also, *Pineview Overlook, Inc. v. Cooper,* No. C2–95–795, 1995 WL 673008 *2 (Minn.App. Nov. 14, 1995) (concluding that the Summons delivered to Cooper's home, and left with his father-in-law, a visitor staying there for ten days, was reasonably calculated to provide notice); but see, *Cleaves v. Funk,* 76 F.2d 828, 829–30 (10th Cir.1935) (requiring permanency of residence); *Burtchaell v. Hoffman,* 508 So.2d 738, 738–39 (Fla.App.1987) (concluding that girlfriend, who was from another State, and who occasionally visited for few days to a week, was not residing

therein); *Gamboa v. Jones,* 455 So.2d 613, 614 (Fla.App.1984) (holding that a ten-day visitor was not residing therein).

As a consequence, since the Plaintiff has satisfied both requirements of Section 580.03, its Motion for Summary Judgment is granted.[5]

■ b. *Prejudice to the Defendants.* According to the Defendants, the Plaintiff's foreclosure by advertisement, under Section 580.03, should be considered invalid, because of the prejudice that they have incurred, as a result of the Plaintiff's failure to serve them personally. In *Farm Credit Bank of St. Paul v. Kohnen,* 494 N.W.2d 44, 48 (Minn.App.1992), the Minnesota Court of Appeals reviewed the applicable case law, and concluded that Courts often consider whether the rights of the parties, who were the subjects of the foreclosure, were prejudiced by the lack of Notice, when determining the validity of service in a particular factual setting. See,

---

5. According to the Defendants, the Plaintiff is not entitled to an award of Summary Judgment because, in effectuating service, it did not comply with the requirements of Minnesota Statutes Section 580.032, by mailing a Notice of the mortgage foreclosure to the Defendants, at least fourteen days prior to the date of sale. Section 580.032 provides as follows:

> A person having a redeemable interest in real property under section 580.23 or 580.24, may file for record a request for notice of a mortgage foreclosure by advertisement with the county recorder or registrar of titles of the county where the property is located. To be effective for purposes of this section, a request for notice must be filed for record as a separate and distinct document, except a mechanic's lien statement filed for record pursuant to section 514.08 also constitutes a request for notice if the mechanic's lien statement includes a legal description of the real property and the name and mailing address of the mechanic's lien claimant.
>
> A person foreclosing a mortgage by advertisement shall mail, at least 14 days before the date of sale, a copy of the notice of sale to each person requesting notice in a recorded request for notice at the address specified in the recorded request for notice. Mailed notice is deemed given upon deposit

in the United States mail first class, postage prepaid, and addressed to the person requesting notice. Notice need not be mailed to a person: (1) whose request for notice was recorded before the recording of the mortgage being foreclosed or after the recording of the notice of pendency provided in subdivision 3; (2) served pursuant to section 580.03; or (3) who no longer has a redeemable interest.

*Minnesota Statutes Section 580.032, Subdivisions (1) and (4)* [emphasis added].

Here, contrary to the Defendants contention, there was no need for the Defendants to comply with the requirements of Section 580.032(4), as there is no evidence in the Record before us that the Defendants filed, with the Wilkin County Recorder, a request for notice prior to the foreclosure sale in October of 1996. Such a request is a condition precedent to the Defendants' entitlement to have a copy of the Notice mailed to them, at least fourteen days prior to the date of the foreclosure sale, as required by the Statute.

Moreover, Section 580.032(4) specifically states that Notice need not be mailed to a person who was served pursuant to Section 580.03. As such, our determination, that the Plaintiff's execution of personal service upon Leske was sufficient to satisfy the service requirements of Section 580.03, has obviated any need to further address the requisites of Section 580.032.

*Farm Credit Bank of St. Paul v. Kohnen,* supra.

For example, *Holmes v. Crummett,* 30 Minn. 23, 13 N.W. 924 (1882), involved foreclosure by advertisement on 78 acres of land which contained a dwelling house and stable that were occupied by a tenant. The tenant, and a nonresident mortgagor, both utilized the land. *Id.* Notice was served on the mortgagor, but not on the tenant. *Id.* In holding the Notice was valid, the Court opined that the object of the statute was accomplished, as to the mortgagor and, since he received notice, he could not complain of any failure to serve the Notice on his tenant. *Id.* The Court stated:

> [I]t is not enough to warrant the granting of relief to one seeking to have a foreclosure set aside or adjudged ineffectual as to him, that there has been an omission of some prescribed act which cannot have affected him, and cannot have been prescribed for his benefit.

*Id.*

Further, in *Skartum v. Koch,* 174 Minn. 47, 218 N.W. 446 (1928), prior to a foreclosure by advertisement, the mortgagors permitted Stevens to build and use a cabin on the subject premises, while subsequently leasing the entire farm to Johnson, who farmed it and remained in possession. *Id.* Notice of foreclosure was served upon Johnson, but not upon Stevens. *Id.* The Court found the Notice valid, and stated that Johnson was the representative of the mortgagor, and that Stevens' use was "subservient" to Johnson's. *Id.* at 446–47. As explained by the Court, the Statute was complied with "in so far as it protected the interests" of the mortgagors, and the spirit and purpose of the Statute was accomplished. *Id.* at 446. The *Skartum* Court reasserted the principle that lack of service cannot be asserted by one who is not affected by that deficiency, and concluded that the mortgagors "were not prejudiced in the slightest" by the failure to serve Stevens. *Id.* at 447.

Finally, *R.I. Hosp. Trust Co. v. Calhoun Beach Holding Co.,* 191 Minn. 354, 254 N.W. 466 (1934), also involved foreclosure by advertisement. In that case, the Notice of foreclosure was served by the first mortgagee on the resident manager, who lived in an apartment on the premises, as well as on the president of the mortgagor holding company who, apparently, did not occupy the premises. Notice of foreclosure, however, was served on only one of the four tenants. *Id.* at 467. In rejecting a challenge to the adequacy of service, the Court observed, once again, that lack of service cannot be asserted by one who was not affected by that lack. *Id.* The Court concluded that, because neither of the complaining parties (the mortgagor and second mortgagee) were prejudiced by lack of service on the tenants, and because the purpose of the Statute was fully accomplished, the Notice was valid. *Id.* at 467–68.

These decisions reflect that, if the rights of the parties to be foreclosed upon were not prejudiced by a lack of notice, service is typically to be considered valid. See, *Farm Credit Bank of St. Paul v. Kohnen,* supra; *Holmes v. Crummett,* supra; *Skartum v. Koch,* supra. Here, our prior conclusion, that service upon the Defendants, via Leske, was adequate, has rendered unnecessary an analysis of whether any prejudice has been experienced by the Defendants. Nevertheless, even if we were to assume that the Defendants never received a formal Notice of the foreclosure sale, we would be forced to conclude that no prejudice resulted from that failure.

As we have previously explained, Leske specifically informed the Defendants that papers, which were intended for them, had been served upon her on August 28, 1996. See, *Leske Dep.,* at 50–51. Following this disclosure, the Defendants refused to accept the papers, and consulted their lawyer, who informed Leske to keep the papers in her purse. *Id.* at 57–58. As well, Maack discussed the upcoming foreclosure sale with the Defendants on several occasions, including September 12, 1996, and October 9, 1996. In this respect, we agree with the Plaintiff's contention, that this

evidence demonstrates that the Defendants' received actual knowledge of the foreclosure sale during the Summer of 1996.

Further, the Defendants have failed to argue, let alone demonstrate, that any lack of notice prevented them from exercising their legal rights. In our considered view, the Record demonstrates that the Defendants intentionally avoided formal notice of the foreclosure sale which occurred in October of 1996. Meanwhile, the Defendants had actual notice of the sale, and took affirmative steps which advanced their interests, well before the foreclosure took place. Consequently, we cannot responsibly accept the Defendants' claims of prejudice, and thereby legitimize the pattern of deception, and evasion, that they displayed, through their apparently concerted efforts to elude service of process during the Summer of 1996.[6]

■ Lastly, our determination, that the Plaintiff properly effected service upon the Defendants, and that the foreclosure on their real property was a valid exercise of the Minnesota foreclosure Statutes, requires our rejection of the Defendants' Counterclaim, which seeks a recoupment of lost rental income as a result of the Plaintiff's foreclosure on their property. Accordingly, Summary Judgment is granted to the Plaintiff on the Defendants' Counterclaim.[7]

NOW, THEREFORE, It is—

ORDERED:

1. That the Plaintiff's Motion for Leave to file a Reply Memorandum [Docket No. 21] is GRANTED.

2. That the Plaintiff's Motion for Summary Judgment [Docket No. 10] is granted in all respects.

---

6. The only claim of prejudice, which is advanced by the Defendants, is that the Plaintiff purportedly did not comply with the farmer-lender mediation requirements of Minnesota Statutes Section 583.24, *et seq.* This alleged prejudice, however, bears no relation to the Plaintiff's allegedly defective service and, therefore, has no relevance to our analysis. However, for the sake of clarification, we note that the Defendants have not submitted any evidence which demonstrates that the Plaintiff neglected to comply with the mediation requirements of Minnesota law. Further, the Plaintiff has demonstrated that it engaged in mediation with the Defendants, albeit unsuccessfully, prior to the foreclosure. See, *Declaration of Brian Hartman*, at ¶¶ 5–7; *Exs. A–C*. As such, the Defendants have also failed to raise a genuine dispute of material fact on this issue.

7. Even if the Defendants' Counterclaim were not defeated by the validity of the Plaintiff's foreclosure proceeding, we would not have *subject matter jurisdiction to consider the* merits of the Defendants' claim. The Defendants do not suggest, let alone show, that they have filed the requisite claim, in accordance with the Federal Tort Claims Act, *Title 28 U.S.C. § 2675(a),* with the pertinent Federal Agency, as well as a showing that the claim was finally denied—conditions precedent to

our exercise of jurisdiction over any such claim. See, *McNeil v. United States*, 508 U.S. 106, 111–112, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993); *Melo v. United States*, 505 F.2d 1026, 1028 (8th Cir.1974); *Peterson v. United States*, 428 F.2d 368, 369 (8th Cir.1970). Nor have the Defendants complied with the Little Tucker Act, *Title 28 U.S.C. § 1346(a)(2),* which vests jurisdiction in the United States Court of Claims, for non-tort actions—if that is what the Defendants' claims were to be considered—that seek damages in excess of $10,000. See also, *Title 28 U.S.C. § 1491(a)(1); Polos v. United States*, 556 F.2d 903, 905 (8th Cir. 1977) (noting claims against United States exceeding $10,000, which are founded upon the Constitution, Federal Statute, Regulation, or contract, are in exclusive jurisdiction of Court of Federal Claims); see also, *Mullally v. U.S.*, 95 F.3d 12, 14 (8th Cir.1996); *St. Louis Union Trust Co. v. Stone*, 570 F.2d 833, 836 (8th Cir.1978); *Thompson v. U.S.*, 408 F.2d 1075, 1081 (8th Cir.1969); *Winston Bros. Co. v. U.S.*, 371 F.Supp. 130, 133 (D.Minn.1973). Since the Defendants' Counterclaim is ineffectual, by virtue of the Federal Government's sovereign immunity, which, under the circumstances of this case, deprives us of subject matter jurisdiction, we would be compelled to enter Summary Judgment for the Plaintiff, even if the claims otherwise had substantive merit.